IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ANDREW ALLEN, *et al.*,

    Plaintiffs,

  v.

UNITED STATES OF AMERICA, *et al.*,

    Defendants.

No. C 16-04403 WHA

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In this Indian tribal rights action, plaintiffs move for summary judgment. Federal defendants oppose and cross-move for summary judgment. For the reasons herein, federal defendants' motion is **GRANTED** and plaintiffs' motion is **DENIED**.

**STATEMENT**

Plaintiffs are a group of Indians seeking to organize as the Ukiah Valley Pomo Indian Tribe on the Pinoleville Rancheria where they reside. The Rancheria is already home to the Pinoleville Pomo Nation (previously known as the Pinoleville Indian Community and the Pinoleville Band of Pomo Indians), a federally recognized tribe, members of which also reside on the Rancheria. Though the two groups were previously a single, unified tribe, our plaintiffs have since relinquished their membership in the Pomo Nation AR 567, 1042–44, 1134–1499).

**1.    HISTORY OF THE PINOLEVILLE RANCHERIA.**

The United States established the Pinoleville Rancheria in 1911 pursuant to the Acts of June 21, 1906 (34 Stat. 325, 333) and April 30, 1908 (35 Stat. 70, 76). In connection with the

purchase, the Office of Indian Affairs compiled a list of 157 Indians residing on the Reservation, which list included ancestors of both our plaintiffs and Indians currently enrolled in the Pomo Nation who live on or near the reservation today (AR 1042–43, 2047–49, 2708).

In 1935, the Indians living on the Pinoleville Rancheria voted to accept the terms of the Indian Reorganization Act. Plaintiffs are among the descendants of individuals who appeared on the eligible voters list assembled in connection with the adoption of the IRA. Despite accepting the terms of the IRA, however, the Indians on the Pinoleville Rancheria were unable to successfully obtain the Secretary of the Interior's approval of a constitution as was required for formal tribal organization, and in 1966 the tribe was terminated pursuant to the Rancheria Act of August 18, 1958 (AR 1043; 72 Stat. 619).

Upon termination, the Secretary of the Interior distributed parcels of the reservation to 67 Indians living on the Pinoleville Rancheria at that time, which distributees included our plaintiffs (and their ancestors), among others. The distributees thereafter organized themselves into a nonprofit freeholders organization who held and managed the property until 1983 (AR 1043).

In 1983, the Pinoleville Rancheria's federal recognition was restored by the stipulated judgment in *Tillie Hardwick v. United States,* No C 79-1710 SW. Thereafter, the Pinoleville Indians again attempted to organize as tribe, but became embroiled in internal tribal disputes. In 2003, after twenty years of attempting to organize and with the assistance of the BIA, the Pinoleville Indians were finally able to resolve their internal disputes and agree to a tribal membership list, which included 307 individuals who were descendants of those listed on enrollment lists created in 1934 and 1937. Based on this list, sixteen of the eighteen plaintiffs were eligible to then vote on tribal leadership. Ten participated in the vote. Several months later, using the same membership list, a majority of the Pomo Indians ratified a constitution, which was approved by the Secretary of the Interior (AR 1044, 2259–65, 761–63, 773).

The constitution provided two ways in which an Indian could qualify for tribal citizenship. He could become a citizen either by showing that he was a descendant of a Captains or Councilmen of the Pinoleville Indians, or by naturalization based upon close social

ties to the Pinoleville Reservation. To receive tribal citizenship based upon social ties, an Indian had to apply for citizenship, and the tribal government had to then make a factual determination regarding eligibility (AR 762–63).

Neither party has submitted evidence showing whether any plaintiffs meet the first definition, and no plaintiffs have applied for naturalization (see *ibid.*). At the November 16 hearing in this action, plaintiffs represented that at least some of them had been disenrolled from the tribe following the 2003 election. The record, however, does not reflect any formal disenrollments (AR 665–66). Instead, it shows that in 2015, in connection with this lawsuit, plaintiffs submitted declarations withdrawing from the Pomo Nation (AR 699–736).[1]

### 2. THE PRESENT TRIBAL RECOGNITION DISPUTE.

The current suit is a continuation of plaintiffs' earlier quest for tribal reorganization, which began in 2008. *See Allen v. United States*, 871 F. Supp. 2d 982, 985 (N.D. Cal. 2012). At that time, a group consisting of some of the plaintiffs in this action as well as other individuals living on the Pinoleville Rancheria petitioned the Secretary of the Interior to allow members of the alleged — though admittedly not federally recognized — Indian tribe to vote on a proposed constitution and organize a tribal government.

That request was eventually denied, and in October 2011, some of the current plaintiffs filed suit against the United States challenging the decision not to call a tribal election. *Id.* at 986–87. The United States moved to dismiss the suit for lack of subject-matter jurisdiction, which motion was granted. *Id.* at 984, 994. The plaintiffs in that action then appealed, and while their appeal was pending entered into a Settlement Agreement with the United States which permitted them to reapply to the Bureau of Indian Affairs for tribal recognition, and detailed what documentation the Regional Director of the BIA would review in making a determination as to whether the applicants met the eligibility criteria to organize under the Indian Reorganization Act of 1934 (AR 52).

---

[1] This order acknowledges an apparent tension between the 2003 membership list, which included our plaintiffs, and the constitutional requirements for membership, which might not automatically include them. Rather, under the constitution certain Indians who were listed as members in 2003 would have to apply for membership in the Pomo Nation, despite their earlier inclusion on the membership list.

3

In accordance with the Settlement Agreement, the BIA published notifications in local papers soliciting comments on the tribal recognition request (AR 224, 231). It received eleven public comments including comments from the Pinoleville Pomo Nation, the federally recognized tribe that resides on and near the Pinoleville Rancheria (AR 371). As required by the Settlement Agreement, plaintiffs submitted various documents including comments to the public notices, and a members list (*id.* at 159). After reviewing the submitted documents, the Regional Director found that plaintiffs did not meet the definition of "tribe" as they were only a subset of the Indians who resided on the Pinoleville Rancheria, and for whom it was set aside, and therefore could not organize under the IRA (*id.* at 1045).

Plaintiffs, eighteen Indians who live on the Pinoleville Rancheria, now contend that the Regional Director relied on criteria not contained in the federal regulations or in the IRA, rendering the decision arbitrary, capricious and contrary to the law (Compl. at 2). They further contend that the Regional Director's decision is not supported by substantial evidence. Accordingly, plaintiffs move for summary judgment, seeking an order declaring that the Regional Director's decision violates the IRA, federal regulations, and the settlement agreement, and directing the Regional Director to call a tribal election. They allege the following five claims: (1) violation of the Fifth Amendment; (2) violations of the IRA; (3) violation of 25 C.F.R. § 81.1(w)(2); (4) violation of Administrative Procedure Act; and (5) breach of trust (*ibid.*).

Federal defendants, the United States of America, the Secretary of the Department of the Interior, Ryan Zinke, and the Regional Director of the Pacific Regional Office of the Bureau of Indian Affairs, Amy Dutschke, oppose plaintiffs' motion and cross-move for summary judgment. Federal defendants assert that the Settlement Agreement limited plaintiffs' cause of action to challenging the Regional Director's decision under the APA, and that the Regional Director's decision was supported by substantial evidence, and was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and must therefore be upheld (Dkt. No. 32 at 1).

This order follows full briefing and oral argument.

4

**ANALYSIS**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). A dispute is genuine only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, and material only if the fact may affect the outcome of the case. Once the moving party has made a threshold showing, the burden shifts to the nonmoving party to prove the existence of a triable issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

### 1. THE SETTLEMENT AGREEMENT PRECLUDES NON-APA CLAIMS.

Pursuant to the Settlement Agreement, plaintiffs agreed that "if they are dissatisfied with the Pacific Regional Director's decision, they will only seek judicial review of that decision in an action challenging that decision under the Administrative Procedure Act, 5 U.S.C. §§ 702, 704, 706(2)" (AR 61). Despite this limiting provision, plaintiffs now bring several non-APA constitutional and statutory challenges to the Regional Director's decision.

Both plaintiffs and federal defendants agree that the language of the Settlement Agreement is clear and unambiguous. Plaintiffs, however, contend that "[t]he purpose of the Settlement Agreement was not to limit the Indians' causes of action" but rather was to "establish the evidence and the process for submission of that evidence to the Director" and in turn "to allow the Indians to seek judicial review of the Director's Decision" based upon the facts set forth in the Administrative record (Dkt. No. 37 at 3). They argue, in essence, that the agreement that they would "only seek judicial review . . . under the Administrative Procedure Act" was merely a way to establish the baseline for the evidence a reviewing court could consider.

This interpretation, however, defies the unambiguous language of the Settlement Agreement, and requires reading language into and out of the contract in order to arrive at the result plaintiffs seek. Plaintiffs do not submit any extrinsic evidence to support their interpretation, or otherwise argue that the contract is ambiguous and requires reformation.

Their interpretation must be rejected. The plain, unambiguous language of the

5

Settlement Agreement permits only APA claims. Accordingly, plaintiffs non-APA claims fail as a matter of law.

### 2. THE REGIONAL DIRECTOR'S DECISION WAS NOT ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION OR CONTRARY TO LAW.

Plaintiffs next argue that the Regional Directors decision that plaintiffs were not a "tribe" was arbitrary and capricious, and should therefore be overturned.

When a district court reviews an administrative agency's decision pursuant to the Administrative Procedures Act, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 770 (9th Cir. 1985). The court must uphold an agency decision unless it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law." 5 U.S.C. 706(2). An agency action should be overturned only when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1224 (9th Cir. 2011).

#### A. The Regional Director Acted Within Her Discretion.

To be considered a "tribe" and have an election called, the Settlement Agreement specifies that Allen must meet the criteria set forth in 25 U.S.C. 5129 (formerly 25 U.S.C. 479) and 25 C.F.R. 81.1(w)(2), the statute and implementing regulation of the IRA, respectively. Section 5129 defines tribe as "any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." 25 C.F.R. 81.1(w)(2), in turn, defines tribe as "any group of Indians whose members each have at least one-half degree of Indian blood for whom a reservation is established and who each reside on that reservation."

It is not in dispute that all plaintiffs possess one-half or more Indian blood and that all

live on the Pinoleville Indian Rancheria, which was created for them and their ancestors, among others (Dkt. No. 30 at 9). The Regional Director, however, found that plaintiffs did not meet the criteria for tribe because they were "only a subset" of the group for whom the Pinoleville Rancheria was established, and on this basis denied plaintiffs' request for tribal organization (AR 1045). The decision stated that "The Department does not interpret the Indian Reorganization Act as permitting splinter groups or factions of a tribe to set up independent tribal government," citing both the IRA and a 1995 decision concerning the Shaahook Group of the Capitan Grande Band of Mission Indians ("Shahook") for support (AR 1045).

Federal defendants argue that requiring a "tribe" to be comprised of more than a "subset" of the Indian's living on a particular reservation, and for whom the reservation was established is the only reasonable interpretation of 25 C.F.R § 81.1(w)(2) and Section 5129 of the IRA (*see* AR 1042). Quoting this Court's earlier order in *Allen v. United States*, 871 F. Supp. 2d 982, 992 (N.D. Cal. 2012), they note that "Section [5129] does not define 'tribe' as ' . . . *some* Indians residing on one reservation. It defines 'tribe' as '*the* Indians residing on one reservation. The inclusion of the definite article 'the' suggests that Congress intended the provisions of the IRA to apply only to an organized group that constituted all or close to all of 'the' Indians residing on one reservation" (Dkt. No. 38 at 7). As that order observed, "[t]o find otherwise would lead to the absurd result whereby any two Indians living on a reservation could create their own tribe and organize under the IRA. This cannot possibly be what Congress intended when it enacted the IRA." *Ibid*.

Further supporting this interpretation, federal defendants observe that 25 C.F.R § 81.1(w)(2)'s use of the phrase "any group of Indians . . . for whom a reservation is established," to define tribe likewise suggests the entire group, as opposed to just a faction (Dkt. Nos. 32 at 19; 38 at 6). Indeed, it would be unusual to interpret the group "for whom a reservation is established" to mean a subset or portion of the group, as plaintiffs urge.

This is especially so in our case given the history of the reservation. The Regional Director took into account the lengthy organization period of the Pomo Nation, which included

7

years of infighting among the currently enrolled members and our plaintiffs (AR1042–43). This ultimately resulted in the organization of a tribe that ten of our eighteen plaintiffs voted on, and that six more were eligible to vote on (*ibid.*; AR 2250). Despite their ultimate dissatisfaction with the leadership of the Pomo Nation, our plaintiffs had an opportunity to vote on the leadership, several of them ran for leadership positions, and they participated in the ratification of the Pomo Nation Constitution (*ibid.*). Furthermore, there is evidence in the record that they have continued to receive benefits from the Pomo Nation, and participate in tribal services such as the Pomo Nation's vocational training program (*see, e.g.*, AR 674–79, 774).

Though the Regional Director expressly declined to address whether plaintiffs' proposed tribe is "all or close to all" of the Indians residing on the Pinoleville Rancheria, she found that plaintiffs fell outside of the definition of tribe set forth in the IRA by dint of being "only a subset of the Indians for whom the Pinoleville Rancheria was set aside" (*see* AR 1045). This finding was based upon a rational interpretation of the relevant statutes as applied to the record, and was not arbitrary, capricious, or an abuse of discretion.

Plaintiffs' arguments to the contrary are unavailing. Plaintiffs first argue that the Regional Director's interpretation has no basis in the IRA or federal regulations, and instead amounts to a re-writing of Congress's unambiguous statutory terms (Dkt. No. 30 at 15). As plaintiffs see it, to meet the criteria set forth in the IRA and 25 C.F.R. 81.1(w)(2), they need only possess half Indian blood or more, and reside on a reservation established for them (*ibid.*; Dkt. No. 37 at 5).[2]

This, however, oversimplifies the definition by omitting critical language set forth above — specifically, that to qualify as a "tribe" the individuals in question must be the "group of Indians . . . for whom a reservation is established," and must be "the Indians residing on one

---

[2] Plaintiffs' citation to St. Croix Band, 1 Op. Solicitor of Dept. of Interior Relating to Indian Affairs 1917-1974 at 1026, 1027 (Jan. 29, 1941), provides no support for plaintiffs' position. That opinion held only that a group of Indians who were "neither a recognized tribe or band nor a group of Indians resident upon a reservation" were "not entitled to organize under the IRA." The opinion did not address whether the members seeking organization were only a subset of the Indians living on the Reservation, the critical issue here.

8

reservation." As noted, when read as a whole the IRA indicates that a tribe must be comprised of more than a subset of the Indians for whom a reservation was established. Indeed, adopting plaintiffs' approach would permit any two Indians living on a reservation to organize as a tribe, so long as they were among the people for whom the reservation was set aside — or, as is the case here, would permit any number of members to voluntarily disenroll from their tribe and form a new tribe of defectors. To repeat, this would be an absurd result, and thus is not a reasonable interpretation of the statute or regulation at issue.[3]

### B. Were There Ambiguities In The IRA, The Regional Director's Interpretation Should Be Accorded Deference.

Though plaintiffs argue that the language in the IRA and its implementing regulation is unambiguous, they nevertheless contend that should the judge determine there are ambiguities, they must be construed in favor of the Indians pursuant to the Indian canons of construction. *see Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985).

This order finds no such ambiguities, and holds the Regional Director reasonably applied the law for the reasons set forth above. Nevertheless, even if an ambiguity existed, *Blackfeet* would not apply because it only applies when tribal interests are aligned against United States' government' interests. *Rancheria v. Jewell,* 776 F.3d 706, 713 (9th Cir. 2015) (citations and quotations omitted). Here, they are not. The Pomo Indian Tribe actively oppose plaintiffs' organization (*see* AR 477–78).

Instead, the Regional Director's interpretation, which is final for the Department of the Interior (*see* AR 1045), is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134

---

[3] Plaintiffs further contend that by citing to the Shahook decision the Regional Director subverted the Settlement Agreement by relying upon authority outside of the IRA (Br. at 10–11). Were Shahook the *sole* authority relied upon by the Regional Director, plaintiffs would perhaps have a point. That is simply not the case, however. The Regional director expressly relied upon the language of the IRA in arriving at her decision, and cited to Shahook only one time, as further support for her interpretation (AR 1045). Moreover, Shahook, while not factually identical to this action, provided support for the Regional Director's decision. There, a subset of an already recognized tribe sought separate federal recognition (AR 1048–49). The Assistant Secretary of the BIA, however, found that the IRA did not permit "splinter groups or factions of a tribe to set up independent governments" (*id.* at 1050). Though the circumstances there were different because the plaintiffs were members of a different recognized tribe, it was not unreasonable for the Regional Director here to look to that decision's interpretation of tribe as not including factions or partial groups.

9

(1944). Because the Regional Director performed a thorough analysis of the record and provided valid, logical reasoning in reaching her result, it is persuasive. *See id.* at 140; *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1113 (9th Cir. 2007).

### C. The Regional Director's Decision Is Supported By Substantial Evidence.

Plaintiffs next argue that even assuming the Regional Director's interpretation of the IRA is reasonable, her decision is not supported by substantial evidence because the finding that the petitioning Indians are only a subset of the Indians for whom the Reservation was originally purchased "is factually incorrect" (Dkt. No. 37 at 7–8). They contend that the record shows the reservation was purchased for homeless California Indians in general, and not for any specific group of Indians (AR 478), and that "there are . . . no facts in the record to support the Director's finding that the Reservation was originally purchased for a larger group of Indians, of which the plaintiff Indians are a subset" (Dkt. No. 37 at 8).

Plaintiffs' interpretation rests entirely on a letter sent by the BIA Superintendent to a teacher operating the BIA School on the Reservation in 1925, in which the Superintendent stated that the land was "purchased by the Government for the sole purpose of providing homes for homeless Indians" (AR 478). This letter, authored fourteen years after the reservation was purchased, does not identify the "homeless Indians" for whom the land was allegedly purchased, or indicate whether the reservation was set aside for any specific group. Plaintiffs argue that based upon this letter, there is no identifiable group for whom the reservation was purchased and therefore they cannot be a "subset" of any such group.

A review of the record, however, shows that the Rancheria *was* purchased for an identifiable (and identified) group of Pomo Indians living near the reservation in 1911 (AR 1042–43). A 1911 letter to the Commissioner of Indian Affairs regarding the funds allocated to purchase the reservation specifically identified 157 Indians of the Pinoleville Rancheria, for whom the land was purchased (AR 2047, 2049). This account is further confirmed by a 1957 Congressional Report on the distribution of land and assets of certain Indian rancherias and

reservations, which gave a background analysis of the Pinoleville Rancheria and observed that it was purchased in 1911 for a group of Pomo Indians living in the area, which was their traditional homeland (AR 2080–81).

Indeed, plaintiffs are descendants of several of the Indians for whom the rancheria was established in 1911 (a fact each of them notes in their declarations submitted to the BIA), which is ultimately what gave them the right to settle on the reservation (*see e.g.*, AR 2049, 1043, 1117, 1218, 1259). This, of course, supports the Regional Director's conclusion that plaintiffs are only a subset of the descendants of the Indians for whom the reservation was set aside.

Moreover, plaintiffs contend that the group for whom the reservation was set aside are those Indians who were given parcels on the reservation at the time it was terminated in 1966. Even if this were the group for whom the reservation was set aside (as opposed to those named in the 1911 conveyance) this would still make plaintiffs only a subset of the group because parcels were given both to the ancestors of plaintiffs and ancestors of enrolled Pomo Nation Indians (*see* AR 1043). Therefore, even accepting plaintiffs' interpretation of which Indians the reservation was set aside for, they still make up only a subset of the group, and the Regional Director's conclusion is still valid.

The Regional Director's conclusion meets the lenient "substantial evidence" standard. It is supported by "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Howard ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1011 (9th Cir. 2003) (citations and quotations omitted). Despite their protest, plaintiffs have not presented any evidence that would lead to the conclusion that they were more than a subset or portion of the Indians for whom the reservation was set aside. Accordingly, the Regional Director's decision is sound and cannot be overturned on this basis.

### D. The Regional Director Has Not Imposed a One-Tribe-Only Rule.

Plaintiffs further argue that the Regional Director has imposed a new "only-one-tribe-per-reservation" criteria by denying plaintiffs a tribal organization vote (Dkt. No. 37 at 9–10). Not so. As illustrated above, the Regional Director drew her interpretation directly from the

11

IRA and its implementing regulation, and reasonably applied the IRA to the circumstances before her. The fact that in this particular case her interpretation resulted in preserving a single recognized tribe on the Pinoleville Rancheria does not, in itself, show that she created a one-tribe-per-reservation rule. Indeed, nothing in the Regional Director's interpretation would prevent two tribes from residing on the same reservation if, for instance, both met the first definition of tribe under the IRA — that is, if they were a historically recognized tribe.

Plaintiffs point to the Wind River Reservation, where two recognized tribes reside, as proof that the one-tribe-per-reservation rule is contrary to the IRA. Those tribes, however, both fall within the IRA's first definition of tribe, which includes historically recognized tribes. *Shoshone Tribe of Indians of Wind River Reservation in Wyoming v. United States*, 299 U.S. 476 (1937). The Regional Director's decision in no way defies such an arrangement and does not rest on a newly created one-tribe-per-reservation rule, as plaintiffs contend.

Based on the foregoing, the Regional Director acted within her discretion to determine that a tribe cannot be comprised of only a subset of the Indians residing on a reservation. Because plaintiffs comprise only a part of the group for whom the Pinoleville Reservation was established, and are only some of the Indians living on the Reservation, the Regional Director was within her discretion when she denied them the right to seek organization. Her determination follows from the language of the statute and implementing regulation and is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

### 3. The Regional Director Did Not Breach Her Trust Duty To Plaintiffs.

Finally, plaintiffs contend that the Regional Director breached her duty of trust to them by breaching the settlement agreement, and her decision should be set aside on this basis (Dkt. No. 30 at 20). This argument, however, simply rehashes their previous arguments. They contend that she applied an erroneous standard by finding that a tribe must be more than a subset of the Indians for whom a reservation is set aside, and that applying this standard amounted to a breach of the agreement because she should have applied plaintiffs' interpretation, which would permit any sub-group of the Indians for whom a reservation is set

aside to attain tribal recognition. For the reasons set forth above, this argument fails. The Regional Director's decision was sound.

**CONCLUSION**

For the foregoing reasons, federal defendants' motion for summary judgment is **GRANTED**. Plaintiffs' motion for summary judgment is **DENIED**. The Clerk shall please **CLOSE THE FILE**.

**IT IS SO ORDERED.**

Dated: November 27, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE